**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

TRAVIS FRANKLIN                          CIVIL ACTION NO. 24-0969

VERSUS                                   JUDGE ALEXANDER C. VAN HOOK

SEACOR MARINE, LLC                       MAGISTRATE JUDGE LEBLANC

## MEMORANDUM RULING

The L/B Robert, a three-legged liftboat operated by SEACOR Marine, LLC ("Seacor"), sustained severe damage when it listed during a storm off the Louisiana coast. Following an inspection, the United States Coast Guard prohibited further movement until repairs were completed. So, the L/B Robert remained out-of-service for a year while a third-party, Bollinger Shipyards ("Bollinger"), carried out $30,000,000 of repairs on its hull, legs, a thruster, and other components. Although Bollinger handled the repairs, Travis Franklin ("Franklin"), a Seacor employee, remained aboard the L/B Robert. During this time, Franklin experienced stroke-like symptoms and later alleged that Seacor's negligence caused his illness. The Court finds that Franklin does not qualify as a seaman under the Jones Act because the L/B Robert was no longer a vessel "in navigation." Accordingly, Seacor's motion for summary judgment is granted.

### Background

The L/B Robert was a liftboat that acted as an "offshore supply vessel" for oil and gas exploration. Atkinson's Dep. 27, Record Document 23-2. As a liftboat, the L/B

Robert had three legs that lowered to the seabed, effectively anchoring itself in-place. *Id.* at 41; Brien's Dep. 15, Record Document 23-3. Then, a hydraulic "rack and pinion system" elevated the vessel's hull above the water, providing a stable platform for offshore operations. Atkinson's Dep. 41, 46. At all relevant times, Falcon Global Robert LLC ("Falcon Global") owned the L/B Robert but Seacor operated it. Ruiz's Decl. 1, Record Document 15-3, at 1.

In late November 2022, the L/B Robert stood in the Gulf of Mexico and found itself caught between approaching "heavy" weather systems. Brien's Dep. 12. The L/B Robert did not have time to move locations, so Seacor employees prepared the vessel for the approaching storm. Record Document 15-3, at 6. The vessel's legs remained anchored to the seabed, and Seacor's crew raised its hull to the maximum possible airgap. *Id.* With the vessel secured, Seacor evacuated its employees, airlifting them to the shore. *Id.*

The storm hit the L/B Robert on November 22, 2022 and had a devastating effect. Pressure from the sea pushed one of the L/B Robert's legs into a "can hole" more than thirty feet away from its original location. Brien's Dep. 13. When the leg fell into the can hole, the L/B Robert "collapsed" and listed "heavily" to its port side. *Id.*; Record Document 15-3, at 6. Although unmanned, an onboard camera recorded the L/B Robert when it titled into the water. Record Document 15-3, at 6.

Within days, Seacor and others began salvage operations. Record Document 15-3, at 6. Initially, Seacor conducted a flyover, observed the L/B Robert's "severe" list, and sent a "skeleton" crew to level the vessel. *Id.* at 6-7.  Although it successfully

leveled the L/B Robert, Seacor struggled to raise the vessel's legs from the "mud" of the seafloor. *Id.* at 6-8. Seacor determined that the L/B Robert's main engines, which generated the power needed to raise the legs, were damaged. *Id.* at 7. After several days of effort, Seacor eventually repaired the vessel's main engines and raised the L/B Robert's legs, allowing it to "float free." *Id.* at 8. But during the process of repairing the vessel's engine, Seacor discovered that a "drive room" for one of its thrusters had structural cracks in the decks and hull plating. *Id.* at 7. Water intruded into the room through these cracks, and Seacor had to pump water from the drive room and weld the cracks closed before its salvage efforts could continue. *Id.*

After stabilizing the vessel, Seacor determined that the L/B Robert could no longer "navigate on her own." Ruiz's Decl. 1. Seacor then hired two tugboats that pulled the vessel to a Bollinger shipyard in Amelia, Louisiana. *Id.* The L/B Robert arrived in Amelia on December 6, 2022, and although Seacor kept a small crew aboard for maintenance tasks, Bollinger and its subcontractors handled all repairs from then forward. *Id.* at 1-2.

Once the L/B Robert reached the shipyard, Bollinger placed the vessel in a drydock to perform inspections. Atkinson's Dep. 21. The United States Coast Guard ("Coast Guard") and the American Bureau of Shipping ("ABS"), the L/B Robert's classification society, also participated in the inspections. Ruiz's Decl. 1. While in drydock, Bollinger, the Coast Guard, and ABS performed an inspection "from stem to stern" of the L/B Robert's hull, legs, and other mechanical and electrical components. Atkinson's Dep. 21. The L/B Robert remained drydocked for about one month, and

3

the inspections revealed that the L/B Robert had suffered extensive damage. Ruiz's Decl. 1.

Bollinger inspected the L/B Robert's legs using drone and laser technology. Ruiz's Decl. 1. The L/B Robert had three legs, each 335 feet long. Atkinson's Dep. 39. And based on the inspection, Bollinger determined that about a 50-foot section on the "upper half of [each] leg" sustained damage when the vessel listed. *Id.* The legs had been so damaged that the Coast Guard described them as "visibly bent." Record Document 15-3, at 19. Because of their extensive damage, the Coast Guard and ABS determined that the L/B Robert's legs needed to be completely replaced. Atkinson's Dep. 43.

However, the legs required specialized materials and metals, and the fabrication process would take a considerable amount of time. Atkinson's Dep. 43. So, as a temporary solution, the Coast Guard and ABS agreed that Seacor could remove the damaged sections, make the legs symmetrical, and then operate in shallower water until the new legs had been fabricated. *Id.* However, Bollinger did not have a crane large enough to handle the leg work in its Amelia shipyard, and determined that after other repairs had been finished, Bollinger would complete the leg repairs in Pascagoula, Mississippi where it had a larger crane. *Id.* at 48.

Although it could not fix the L/B Robert's legs in Amelia, Bollinger and its subcontractors started on some of the other extensive repairs that the vessel needed. Brien's Dep. 16-17. Much of the work in Amelia focused on repairing damage to the L/B Robert's hull, components, and one of its thrusters. *Id.*

4

As for its hull and components, the L/B Robert "suffered severe structural stresses that resulted in extensive buckling of hull structural members and plating." Record Document 15-3, at 8. The structural damage spanned the vessel, including the thruster drive rooms, crew housing areas, engine room, and main deck. *Id.* at 9-13. The damage, too extensive to itemize here, included "deep cracks, buckling, [and] deformation" across dozens of feet of decking, plates, and transoms. *Id.* The vessel's lifeboats needed multiple repairs, and its life rafts and fast rescue boat were "missing completely." *Id.* at 11-12; *see also* Record Document 15-3, at 19. The L/B Robert's main engine suffered damage, including blown gaskets, deformed dampers, and cracked thermostats. Record Document 15-3, at 12. Bollinger "completely repaired" this hull damage in Amelia. Brien's Dep. 18.

As for its thrusters, the L/B Robert depended on two stern thrusters for propulsion. Brien's Dep. 18. The vessel also had a bow thruster, but it only supported "maneuvering" in "close quarters" and not propulsion forward. Atkinson's Dep. 47. During inspections, Bollinger discovered that one of the L/B Robert's thrusters, the starboard stern thruster, was not operational. Atkinson's Dep. 25; Brien's Dep. 18. Bollinger determined that the electric motor, which powers the thruster, took on water during the listing event, debilitating the motor. Brien's Dep. 18. The electric motor had been so damaged that Bollinger removed the motor completely and sent it to a different vendor, Houma Armature, for repair. Brien's Dep. 18-19. Houma Armature "rebuilt" the electric motor before installing the equipment back into the L/B Robert. *Id.* at 19.

After rebuilding the motor, Seacor hoped to obtain a "permit to proceed" from the Coast Guard that would allow the L/B Robert to sail on its own power from Amelia to Pascagoula where Bollinger would complete the remaining repairs. Atkinson's Dep. 48. But when Seacor tested the starboard stern thruster and its rebuilt electric motor, the thruster failed. *Id.* at 47-49. As one Seacor employee explained, despite the rebuilt motor, the thruster's electrical components "shorted out" and "failed" when tested, so the thruster remained inoperable. *Id.* at 38, 47-49. Furthermore, because of the repair timeline, Bollinger's contractors did not have time to replace the electrical components and wiring before the L/B Robert went to Pascagoula. Brien's Dep. 19-20.

On May 11, 2023, before the L/B Robert left Amelia, the Coast Guard inspected the vessel and issued Form CG-835V. Ruiz's Decl. 2; Record Document 15-3, at 19. In the form, the Coast Guard noted that the L/B Robert had been in "a major maritime incident" and listed deficiencies that needed repairs, including "visibly bent" legs and damaged lifeboats. Record Document 15-3, at 19. Importantly, the Form CG-835V classified the deficient legs as "Action Code 60," meaning Seacor must "Rectify deficiencies prior to movement." *Id.*; *see also* Atkinson's Dep. 29. A Seacor employee emphasized the importance of this classification, explaining that it functioned as a "no-sail" order from the Coast Guard, and the L/B Robert could not "go anywhere under its own power until the legs were replaced." Brien's Dep. 21.

Two weeks later, on May 29, 2023, Seacor moved the L/B Robert from Amelia. Ruiz's Decl. 2. In total, the L/B Robert spent five and a half months undergoing

repairs in Amelia, including one month drydocked. *Id.* at 1. After Amelia, the L/B Robert went to Bollinger's shipyard in Pascagoula where Bollinger continued its repairs. *Id.* at 2. However, because the L/B Robert still had an inoperable stern thruster and floated under a Coast Guard no-sail order, Seacor could not sail the vessel under its own power to Pascagoula. Brien's Dep. 21; Atkinson's Dep. 39. Instead, for a second time, two tugboats pulled the L/B Robert to its next destination. Ruiz's Decl. 2.

In Pascagoula, Bollinger and its contractors continued their repairs on the L/B Robert. Throughout the vessel's time in Pascagoula, the L/B Robert had its legs lowered to the seafloor and its hull elevated above the dock to facilitate Bollinger's repairs. Atkinson's Dep. 40. One Seacor employee explained that the hull stood 125 feet above the water's surface, and "we were up above the trees and everything, way up in the air." *Id.* at 42. Because of its height, Bollinger fabricated a 15-story elevator, stair tower, and gangway bridge, connecting the L/B Robert to the dock and giving its employees access. *Id.* The L/B Robert remained in this configuration until Bollinger completed its repairs. *Id.*

Travis Franklin, a Seacor employee, accompanied the L/B Robert to Amelia and Pascagoula. Franklin's Dep. 78, Record Document 15-5. Franklin held the title of crane operator, but while the vessel underwent repairs, Franklin performed maintenance instead. Atkinson's Dep. 55; Franklin's Dep. 82. In his deposition, Franklin explained that maintenance meant: "[c]hipping paint, inventorying supplies, assisting people coming on [and] directing them where to go[.]" Franklin's

Dep. 82-83. According to Franklin, on July 30, 2023, he experienced a stroke after being exposed to excessive heat during his shift onboard the L/B Robert. Record Document 1, at 2; Franklin's Dep. 93-94. Franklin did not return to the L/B Robert after his illness. *See* Franklin's Dep. 77.

At the time of Franklin's illness, the L/B Robert still had substantial repair work ongoing in Pascagoula. The vessel continued using shore power, as it had throughout the repair process. Brien's Dep. 43. The damaged stern thruster still was not considered operational, and the legs had not been repaired. Atkinson's Dep. at 26; *see also* Brien's Dep. 36-39, 56 (explaining that a third-party did not complete the electric thruster controls until "late July" and "everything was waiting on the legs[.]"). And importantly, the vessel remained under a no-sail order from the Coast Guard. *Id.* at 45.

Bollinger completed its repairs of the L/B Robert sometime in November 2023, about one year after repairs began. Brien's Dep. 56. A Seacor employee explained that Seacor first contacted the Coast Guard to reinspect the L/B Robert in October but had to postpone the inspection several times because it "wasn't ready for inspection" and the repair work had not been completed. *Id.* at 44, 56. In total, the L/B Robert repairs cost Seacor more than $30,000,000. Ruiz's Decl. 2. The L/B Robert only has a value of $55,000,000 so the repair costs amounted to 55% of the vessel's value. *Id.*

After the repairs, on July 19, 2024, Franklin filed a complaint against Seacor. Record Document 1. Franklin alleged that Seacor required him to work on the L/B Robert and exposed him "to excessive heat and other hazards." *Id.* at 2. Franklin

asserted that he "was a Jones Act seaman" and stated causes of action for negligence, unseaworthiness, and maintenance and cure. *Id.* at 1-3. In the alternative, Franklin asserted claims for negligence under Louisiana law, general maritime law, and 33 U.S.C. § 905(b). *Id.* at 2. Now, Seacor has filed a motion for summary judgment arguing that Franklin's claims fail because the L/B Robert was not a "vessel in navigation" and his exclusive remedy is statutory payments for his illness. Record Document 15-1, at 6. Neither party has demanded a jury. *See* Record Document 10 (noting "a review of the pleadings did not identify a jury demand by either party.").

## Standard

Federal Rule of Civil Procedure 56(a) requires a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When the burden at trial will rest on the nonmovant, the movant need not produce evidence to negate the elements of the nonmovant's case; rather, it need only point out the absence of supporting evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant satisfies its initial burden, the nonmovant must demonstrate a genuine dispute exists by "going beyond the pleadings" and "designating specific facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). This burden requires more than metaphysical doubt, conclusory or unsubstantiated allegations, or a mere scintilla of evidence. *Id.*

Ordinarily, the trial judge does not "weigh evidence, assess credibility, or [make] inferences" when considering a motion for summary judgment. *Honore v.*

9

*Douglas*, 833 F.2d 565, 567 (5th Cir. 1987). But the summary judgment standard in a bench trial is unique. *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019).

When there's no jury, the trial judge is the "ultimate trier of fact." *In re Placid Oil*, 932 F.2d 394, 398 (5th Cir. 1991). Although the trial judge cannot make inferences on "issues of witness credibility or disputed material facts[,]" the trial judge can make inferences based "on what has been incontrovertibly proven." *Id.*; *Mason Gulf LLC v. Mod. Am. Recycling Serv.*, 878 F.3d 130, 132 (5th Cir. 2017). Indeed, the trial judge can "decide that the same evidence, presented to him as a trier of fact in a plenary trial, could not possibly lead to a different result." *Jones*, 936 F.3d at 321. And the trial judge should "draw his inferences without resort to the expense of trial" when a trial would not "enhance the district court's ability to draw inferences and conclusions." *In re Placid Oil*, 932 F.2d at 397.

### Analysis

The Jones Act and the Longshore Harbor Workers' Compensation Act ("LHWCA") are the two "principal remedies" available to an injured maritime worker. *Cain v. Transocean Offshore USA, Inc.*, 518 F.3d 295, 298 (5th Cir. 2008). If a maritime worker qualifies as a "seaman," he falls under Jones Act protections and not the LHWCA. *Becker v. Tidewater*, 335 F.3d 376, 380 (5th Cir. 2003). Under the Jones Act, a seaman can sue his employer for its negligence and has unlimited damages. *Cain*, 518 F.3d at 295. Conversely, if he does not qualify as a seaman, he is covered only by the LHWCA. *Becker*, 335 F.3d at 380. The LHWCA provides a no-fault workers' compensation scheme against a worker's employer for his injury. *Id.*

10

(explaining the LHWCA also provides a negligence cause of action against a vessel owner and non-vessel third parties).

In this case, all of Franklin's causes of action, including those for negligence, unseaworthiness, and maintenance and cure, depend on him qualifying as a seaman for purposes of the Jones Act. *See, e.g.*, *In re Ingram Barge Co.*, No. 22-30577, 2023 WL 6123107, at *2 (5th Cir. Sept. 19, 2023) ("[I]f the worker fails to qualify as a Jones Act 'seaman'…no negligence claims are available against the [worker's] employer[.]"); *Hall v. Diamond M Co.*, 732 F.2d 1246, 1248 (5th Cir. 1984) ("Only seamen are entitled to the benefits of maintenance and cure."); *Becker*, 335 F.3d at 387 ("An LHWCA worker, unlike a Jones Act seaman, does not have a cause of action for unseaworthiness.").

## I.    **Seaman Status and the Jones Act**

To qualify as a seaman under the Jones Act, a maritime worker must have a connection to a vessel "in navigation." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 373 (1995). Whether a vessel was in navigation is a fact-intensive inquiry. *Id.* In this case, neither party disputes that the L/B Robert had once been in navigation. Instead, the parties disagree on whether the ship left navigation during its extensive repairs, and if it did, the parties then dispute whether the ship had returned to navigation when Franklin experienced his illness.

Generally, a vessel does not cease being in navigation when undergoing repairs "at anchor, berthed, or at dockside." *Chandris*, 515 U.S. at 373-74. But at some point, the "repairs become sufficiently significant that the vessel can no longer be considered

in navigation." *Id.* As the United State Supreme Court has made clear, "major renovations can take a ship out of navigation, even though its use before and after the work will be the same." *Id.*

For example, in *Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995), the Supreme Court found that a vessel may have left navigation where it had been in drydock for six months undergoing significant repairs and modifications to its plates, propellers, thrusters, engine, boilers, and interior. Also, in *Chandris*, the Supreme Court cited *Wixon v. Boland Marine & Mfg. Co.*, 614 F.2d 956 (5th Cir. 1980) as an example of when repairs remove a ship from navigation. There, the United States Court of Appeals for the Fifth Circuit held that the vessel was not in navigation because the repair cost exceeded $25,000,000, lasted for three years, and the engine and propellers were out of service for "at least some time." 614 F.3d at 957.

When determining whether repairs have removed a ship from navigation, the district courts consider several factors, including: (1) the nature of the repairs being performed; (2) the duration of these repairs; (3) the cost of the repairs in comparison to the ship's value; (4) whether the vessel's operator relinquished control of the repairs to a shore based third party; and (5) the length of time the ship was "laid up." *Warwick v. Huthnance Div., Grace Offshore Co.*, 760 F. Supp. 571, 573 (W.D. La. 1991); *Thomas v. Dual Marine Drilling Co.*, No. 95-0863, 1996 WL 20846, at *3 (E.D. La. Jan. 17, 1996) (adopting factors); *Newsom v. Jantran, Inc.*, No. 12-150, 2013 WL 12178166, at *1 (N.D. Miss. Dec. 9, 2013) (same).

12

First, the Court finds that the nature of the repairs was "sufficiently significant" to remove the L/B Robert from navigation. Although Franklin portrayed the repairs as minor, Record Document 23, at 11-12, the Court finds that characterization unpersuasive.[1] The L/B Robert suffered extensive damage throughout its major systems, including a thruster, leg, engine, hull, plates, beams, and electrical components. For example, the electrical motor powering the thruster had taken on water and required a complete rebuild. Brien's Dep. 18-19. The L/B Robert's legs, which represented its utility as a tool of commerce, had been "visibly bent" and needed huge portions removed before it could reenter service. Atkinson's Dep. 39. The ship's engine needed repairs for blown gaskets, deformed dampers, and cracked thermostats. Record Document 15-3, at 12. As for the hull, the L/B Robert had "severe structural stresses that resulted in extensive buckling of hull structural members and plating." *Id.* at 8.

Second, the Court also finds that the duration of the repairs was sufficient to remove the L/B Robert from navigation. After the storm and listing event, the L/B Robert spent one year out-of-service and undergoing repairs. Ruiz's Dep. 1-2; c*ompare Aguilar v. Bollinger Shipyards, Inc.*, 833 F. Supp. 2d 582, 590 (E.D. La. 2011) (finding vessel remained in navigation when repairs lasted one month)*, and Newsom*, 2013 WL 12178166, at \*2 (ruling vessel didn't leave navigation when repairs lasted "only

---

[1] Multiple times in his opposition memorandum, Franklin tried to create a genuine dispute of material fact through incomplete, selectively chosen citations to the deposition records. During its consideration of this motion, the Court reviewed the full deposition transcripts to ensure it had an accurate depiction of the witnesses' testimony.

sixty-six days), *with Wixom*, 614 F.2d at 957 (holding a vessel left navigation when it spent three years undergoing repairs).

Third, the Court finds that the cost of repairs when compared to the L/B Robert's value also indicates that it left navigation. Repairing the L/B Robert cost an exorbitant amount, more than $30,000,000, and even when compared to the ship's value of $50,000,000, those repairs amounted to 55% of its worth. Ruiz's Dep. 2; *see, e.g.*, *Dufrene v. Hosp. Enter., Inc.*, 523 F. Supp. 3d 913, 919-20 (E.D. La. 2021) (finding ship ceased navigation when it underwent $13 million of work); *Desroches v. Sonat Expl.*, No. 91-4506, 1993 WL 322969, at *1 (E.D. La. Aug. 12, 1993) (holding upon rehearing that vessel left navigation because "the cost of the repairs represented nearly half the value of the vessel"); *Wixom*, 614 F.2d at 956 (ruling vessel was not in navigation where the cost of repairs exceeded $25 million).

Fourth, Seacor released control of the repairs to a shore based third-party, further establishing that the L/B Robert left navigation. Bollinger and its contractors handled all repairs to the vessel at their shipyards in Amelia and Pascagoula. Ruiz's Dep. 1. For example, Bollinger handled the repairs to the legs, Houma Armature rebuilt the thruster's electrical motor, and Karl Senner completed the electrical components. Brien's Dep. 18-19, 36, 40. Although Franklin and other Seacor employees remained with the L/B Robert, they handled maintenance and not repairs. Franklin's Dep. 82-83.

Finally, the L/B Robert was "laid up" much of the year that it spent undergoing repairs. In Pascagoula, to facilitate Bollinger's repairs, the L/B Robert had its legs

lowered to the seafloor and it stood dockside. Atkinson's Dep. 40. The vessel's hull was raised 125 feet above the water's surface, and Bollinger connected the L/B Robert to the dock using a gangway bridge and 15 story stairwell that it had to specially fabricate. *Id.* at 42. And the L/B Robert remained in this configuration until Bollinger completed its repairs. *Id.* In addition, the L/B Robert spent one month in drydock undergoing repairs while in Amelia. Ruiz's Dep. 1.

The Court finds that the L/B Robert repairs were "sufficiently significant" such that it "can no longer be considered in navigation." *Chandris*, 515 U.S. at 373. The repairs amounted to a major reconstruction of the L/B Robert's important systems, like its legs and thruster. And the repairs, costing a steep $30,000,000, had been carried out by a shore-based third-party over the course of a year, and throughout that time, the L/B Robert had been "laid up."

Despite its extensive repairs, Franklin argued that the L/B Robert satisfied the "in navigation" inquiry because it was "fully capable of navigation" when his illness occurred on July 30, 2023. Record Document 23 at 14. According to Franklin, Bollinger had completed the thruster repairs, which the vessel needed for propulsion, and repairing the legs is all that remained. *Id.* at 11-12. In effect, Franklin argues that the L/B Robert had reentered navigation when his illness happened.

The Fifth Circuit has yet to define a specific test for when a vessel reenters navigation following repairs. But at least one district court has rejected Franklin's proposed "capable of navigation test", opting instead for an "intended purpose analysis."

In *Dufrene v. Hospitality Entreprises, Inc.*, the court addressed "whether a ship that was withdrawn from navigation has reentered navigation." 523 F. Supp. 3d at 921. The court explained that a policy goal of the "in navigation" requirement is to "prevent oscillation in and out of Jones Act coverage." *Id.* at 922. Rejecting the plaintiff's "capable of navigation" test, the court explained that such a test could cause maritime workers to oscillate in and out of Jones Act coverage because "there are numerous stages of construction where a ship is arguably 'practically capable' of transportation." *Id.* Instead, the court asked, "whether the ship had been placed in commerce for its intended use," because this test "draws a bright line, preventing uncertainty in the analysis." *Id.* at 922.

This Court finds the reasoning of *Dufrene* persuasive and holds the intended purpose analysis is the correct test for determining when a vessel has reentered navigation. Once a ship has left navigation for purposes of the Jones Act, whether for conversion or repairs, the intended purpose analysis creates a bright line for resolving when the vessel reenters navigation. Unlike the capable of navigation test, where a vessel's ongoing repairs could make it capable of navigating one day but not the next, the intended purpose test ensures maritime workers do not "walk into and out of coverage in the course of his regular duties." *Chandris*, 515 U.S. at 363.

But regardless of whether the Court applies the capable of navigation test or the intended purpose test, the result is the same—the L/B Robert had not reentered navigation when Franklin's illness occurred. At that time, the L/B Robert was neither capable of navigation nor useful for its intended purpose because the vessel could not

16

legally operate and repairs were ongoing. Repairs to the L/B Roberts legs did not finish until months after Franklin's illness, and more importantly, the Coast Guard also did not lift its "no sail" order until months later. *See, e.g., Cain,* 518 U.S. at 302 (concluding that a vessel was not capable of navigation where the Coast Guard had not legally permitted it to operate); *Dufrene,* 523 F. Supp. 3d at 923-24 (same). Seacor employees were explicit in their testimony that this "no sail" order meant the L/B Robert could not "go anywhere under its own power until the legs were replaced." *Brien*'s Dep. 21. Accordingly, the Court finds that the L/B Robert had not reentered navigation when Franklin's illness happened.

In conclusion, the Court acts as the ultimate trier of fact in this non-jury case, and after considering only the undisputed facts, the Court finds that the L/B Robert was not a vessel in navigation when Franklin's illness occurred. Even if presented at a plenary trial, the same evidence "could not possibly lead to a different result." *Jones* 936 F.3d at 321. Because the L/B Robert was not a vessel in navigation, Franklin does not qualify as a "seaman," and his Jones Act claim fails.[2]

## II.   Unseaworthiness and Maintenance and Cure

Franklin also asserted causes of action for unseaworthiness and maintenance and cure. However, such claims are only available to a Jones Act seaman. *Hall,* 732 F.2d at 1248 ("Only seamen are entitled to the benefits of maintenance and cure."); *Becker,* 335 F.3d at 387 ("An LHWCA worker, unlike a Jones Act seaman, does not

---

[2]    Although the Court employed the more lenient standard used in non-jury cases to decide this motion, the Court would have reached the same result even using the ordinary standard applied in jury cases.

have a cause of action for unseaworthiness."). Because the Court has ruled that Franklin does not qualify as a Jones Act seaman, Franklin has no cause of action for unseaworthiness and maintenance and cure.

### III.    Alternative Causes of Action

Finally, Franklin pleaded alternative negligence causes of action against his employer, Seacor, under 33 U.S.C. § 905(b), Louisiana law, and general maritime law. Record Document 1, at 2. Generally, the LHWCA's compensation scheme is the exclusive remedy for an injured maritime worker against his employer. *Becker*, 335 F.3d at 380.  As such, the LHWCA prohibits a maritime worker's negligence action against his employer, including those arising under Louisiana law and general maritime law. *See, e.g.*, *Dufrene*, 523 F. Supp. 3d at 926 ("Because NOP is plaintiff's employer, the LHWCA's remedy is exclusive."); *Warwick*, 760 F. Supp. at 574 ("The LHWCA prohibits plaintiff from recovering from his employer, GOC, on his general maritime law negligence and unseaworthiness claims.").

The only exception to the LHWCA's exclusivity provision is 33 U.S.C. § 905(b), which allows a maritime worker to bring a negligence claim against the owner of a vessel. In this case, Franklin has filed an action against Seacor, his employer and the operator of the L/B Robert, but not Falcon Global, the owner of the L/B Robert. Ruiz's Dep. 1. Accordingly, Franklin has no cause of action against Seacor under § 905(b), and the LHWCA's exclusivity provision otherwise bars his negligence claims under Louisiana law and general maritime law.

## Conclusion

Because Franklin does not qualify as a seaman for purposes of the Jones Act, his exclusive remedy is the compensation scheme of the LHWCA. Therefore, Franklin's various claims for negligence, unseaworthiness, and maintenance and cure fail as a matter of law, and Seacor's motion for summary judgment is **GRANTED**.

**DONE AND SIGNED** at Shreveport, Louisiana, this 24th day of March, 2026.

_____

**ALEXANDER C. VAN HOOK**
**UNITED STATES DISTRICT JUDGE**